## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JON COSPER, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| FANDUEL, INC., and DRAFTKINGS, INC., | |
| Defendants. | |

### CLASS ACTION COMPLAINT

Plaintiff Jon Cosper ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, brings this class action against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), (collectively "Defendants"), and allege the following upon information and belief:

### I.     NATURE OF THE CASE

1.     This is a class action complaint against FanDuel and DraftKings, two companies operating daily fantasy sports ("DFS") websites in a manner that violates the law.

2.     DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis. That is, Defendants operate tournaments where individuals accumulate points based on the real-life statistics of players in professional sporting events that occur on a particular day. Individuals can play for free or pay money to compete for cash prizes.

3.     The start of the 2015 NFL season saw a huge media blitz as Defendants spent more than $100,000,000 on television ads and became two of the top television advertisers in the

United States. As a result of this advertising blitz, Defendants added millions of new users.

4.      Defendants make money on the fee they take from each entry into their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

5.      The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

6.      Draft Kings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site. According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.

7.      The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.

8.      These material misrepresentations and omissions fraudulently induced Plaintiff and members of the proposed Class to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

9.      Defendants' omissions of, and deliberate misrepresentations related to, critical information regarding fairness of their DFS contests have caused financial harm to Plaintiff and the Class, who hereby seek compensatory, punitive and statutory damages, injunctive relief to prevent Defendants from continuing their unlawful activities, reasonable attorneys' fees and such other just relief as the Court may award.

## II.    PARTIES

10.    Plaintiff Jon Cosper is a resident of Harahan, Louisiana.  Plaintiff brings this action individually and on behalf of a class of persons similarly situated as described in the proposed Class below.  At all times relevant, Plaintiff paid for entry into DFS contests and deposited monies onto Defendants' websites during the Class Period.  As a result of Defendants wrongful conduct alleged herein, Plaintiff has been injured.

11.    Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

12.    Defendant DraftKings, Inc., is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

## III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000, and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.  Jurisdiction also rests under 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States.

14.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.

15.    This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

16.    Venue is appropriate in this District under 28 U.S.C. §1391 because Defendants,

4

as corporations, are deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, Defendants transact business within this District, and the interstate trade and commerce described herein is carried out, in substantial part, in this District.

### IV.    FACTUAL BACKGROUND

#### A.    *Daily Fantasy Sports*

17.     Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market. It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

18.     Defendants held themselves out to Plaintiff and members of the Class as places where their skill made a difference between winning and losing. For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills....you like football, you like winning." In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills...we don't just play, we are players, we train, and we win."

19.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

20.     In reality, most of the money on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.  An

analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1% of players.

**B.**     ***Value of Inside Information and Data***

21.     DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

22.     DFS is not gambling because of the skill involved in picking a winning team. According to the CEO of DraftKings, Jason Robins, DraftKings attracts players "who are analytical and favor data and research." Robins said: "They do their homework. It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."

23.     The biggest edge any player can have comes from having data and information. DraftKings and FanDuel employees have access to both things, neither of which is public.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests. DraftKings knows the value of this data and knows that it should not be shared: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing... That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently.  And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK.  There are plenty

of people who stack and win very consistently."  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered.  Take a look at some other site winning lineups and add it up for DK, you'll see it happening."

24.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

25.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

26.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

27.     Indeed, a DraftKings employee accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed. This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."

28.     However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000. An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside

DraftKings working for a DFS company.

29.     FanDuel and DraftKings, in concert, said that this employee beating 229,883 people – in the same week he clearly had access to ownership data – was a "coincidence."

30.     In all, DraftKings employees have won at least $6,000,000 playing at FanDuel, which is more than one million dollars per year considering DraftKings is only a few years old. The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

31.     DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.

32.     FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.

33.     Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice. Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."

34.     Robins also admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

35.     Robins had previously discussed any sort of issue that affected "game integrity" as fraud, and literally the first person to respond is the employee who won $350,000.

36.     In that post, Robins uses the word "fraud" or "fraudster" nine times. Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

37.     For instance, an analysis by DFS Report shows that an employee at FanDuel who works in product operations is one of the top 50 players in all of DFS, despite only playing on one site.  While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites.  One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article has been removed from FanDuel's website, a version is still on the Internet. In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy...or 10."

38.     According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"  FanDuel's CEO admitted to personally playing on competitor sites.

39.     Had Plaintiff and/or members of the Class known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiff and members of the Class would not have played on Defendants' websites.

40.     Had Plaintiff and/or members of the Class known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the Class would not have played on Defendants' websites.

41.     Overall, Plaintiff deposited $100 before the disclosure of the fact that DFS employees were playing with inside information.

42.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, FanDuel and DraftKings issued numerous joint and/or identical statements on their websites, continuing to act in concert.

43.     FanDuel and Draft Kings both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

44.     Plaintiff and members of the Class were fraudulently induced into placing money onto DraftKings because it was supposed to be a fair game of skill without the potential for insiders to use non-public information to compete against them.

45.     As a direct and proximate result of the actions described above, Plaintiff and members of the Class have been damaged.

*C.      DraftKings, Inc. and FanDuel, Inc. enjoined and restrained from operating in New York*

46.     On December 12, 2015, a motion by the New York Attorney General's Office was granted enjoining and restraining DraftKings, Inc. and FanDuel, Inc. from operating in the State of New York further demonstrating the illegality of Defendants' conduct.

## V.      CLASS ALLEGATIONS

47.     Plaintiff brings this action on behalf of himself and, under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) as a representatives of the proposed Class defined as follows:

"All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."

48.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the parties engage in discovery.

49.     Excluded from the proposed Class are:

a)      Defendants and any entities in which Defendants have a controlling interest;

b)      Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c)      Any co-conspirators:

d)      The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

e)      All persons or entities that properly execute and timely file a request for exclusion from the Class; and

f)      Any attorneys representing the Plaintiff or the proposed Class.

50.     A class action is the proper form to bring Plaintiff's claims under the applicable law. The potential class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

51.     This action satisfies all of the requirements of Federal Rule of Civil Procedure 23,

including numerosity, commonality, typicality, adequacy, predominance and superiority.

52.     Numerosity: the class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  News accounts discuss how millions of users compete on the websites of Defendants.

53.     Commonality: the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation.  These shared questions predominate over individual questions, and they include, without limitation:

a)     Whether Defendants made the representations set forth above and substantially similar representations to Plaintiff and members of the Class;

b)     Whether Defendants' advertisements were false, misleading, or unfair;

c)     Whether Defendants owed duties to Plaintiff and members of the Class, the scope of those duties and if they breached those duties;

d)     Whether Defendants fraudulently induced Plaintiff and members of the Class into using their website under false pretenses, through material misrepresentations or material omissions;

e)     Whether consumers were harmed by Defendants' actions as described above;

f)     Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and

members of the Class that these practices were occurring;

g)      Whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiff and members of the Class;

h)      Whether Defendants are liable to Plaintiff and members of the Class for damages for conduct actionable under RICO;

i)      Whether Defendants are is liable to Plaintiff and members of the Class for damages for conduct actionable under various state Consumer Protection Statutes;

j)      Whether Defendants unjustly enriched themselves by its acts and omissions, at the expense of Plaintiff and members of the Class; and

k)      The extent of the damages caused by Defendants' acts.

The common questions of law and fact identified above are common to the Class and predominate over questions affecting only individual members.

54.     Typicality: Plaintiff's claims are typical of those of the other Class Members because Plaintiff, like every other Class Member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

55.     The claims of the class representative Plaintiff are furthermore typical of other Class Members because they make the same claims as other class members.  Plaintiff has an interest in seeking compensation from Defendants.

56.     Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the classes.  Plaintiff seeks no relief that is antagonistic or adverse to the

members of the class and the infringement of the rights and the damages they have suffered are typical of other class members.

57.     Superiority: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require.  Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

58.     The nature of this action and the nature of state and federal laws available to Plaintiff and the members of the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the class and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

59.     Plaintiff will fairly and adequately protect the interests of the Class.  The interests of the class representative are consistent with those of the other members of the classes. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

60.     Proceeding as a class action is a superior method for fairly and efficiently adjudicating this controversy.  There are no known circumstances presenting difficulties in management that would preclude maintenance as a class action.  Furthermore, any potential difficulties in maintaining this action as a class action are greatly outweighed by the benefits of proceeding through the class mechanism – *i.e.*, providing persons and entities a method for pursuing claims that would not be practicable if pursued on an individual basis.

## VI.     CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF 18 U.S.C. § 1962 (C)

61.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

62.     Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

63.     DraftKings associated with or combined with FanDuel for the common purpose of engaging in a course of racketeering conduct, specifically, the development of a market for DFS through fraudulent means.

64.     This association in fact enabled Defendants to fraudulently market and promote their websites and ultimately develop a niche market.

65.     Defendants fostered their enterprise through the deceptive marketing practices

outlined above to increase the number of paying contestants on their websites.

66.     Defendants created and maintained their enterprise through a systematic pattern of racketeering activity, including deceptive or fraudulent marketing and improper inducements to individuals – exploiting a niche in the market.

67.     Defendants received substantial revenue from their scheme, and these revenues were far greater than they would have been had the fraudulent acts not been undertaken. As distinct entities, both of the Defendants profited from the exercise of the enterprise.

68.     The behavior of the Defendants, as distinct entities acting in concert, constituted an ongoing pattern of activity that affected interstate commerce, because, *inter alia*, the fraudulent activities described herein led to the marketing and sale of DFS contests to millions of individuals throughout the United States.

69.     Defendants conducted and participated in the affairs of their deceptive marketing enterprise through patterns of racketeering activity that included acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct unlawful activity).

70.     Defendants' use of the mails and wires to perpetuate their fraud involved thousands of communications, including but not limited to:

> a.     communications with and among enterprise participants that led to the suppression and failure to timely disclose negative information that called into question the fair play of their contests;
>
> b.     communications with and among the enterprise participants that fraudulently misrepresented the fair play of their contests amongst themselves and others;
>
> c.     communications with individuals, including Plaintiff, inducing payments for DFS contests by misrepresenting the fair play of their contests;

      d.      receiving the proceeds in the course of and resulting from Defendants' improper scheme;

      e.      transmittal and receipt of monies from players;

      f.      communications with and among the enterprise participants to conceal the fraud occurring by virtue of failing to disclose the results of negative reports;

      g.      communications with and among the enterprise participants to develop and implement the promotional strategy;

      h.      communications with and among the enterprise participants to develop and implement the publications strategy; and

      i.      transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the deceptive marketing scheme.

71.     Defendants knew that without their fraudulent scheme, consumers would not have paid to play DFS on their websites. At all times during the fraudulent scheme, Defendants and the fraud participants had a legal and ethical obligation of candor and honest dealing with consumers.

72.     Defendants' scheme was calculated to ensure that consumer participation in DFS contests was sold in great quantities with the knowledge of and active suppression of reports indicating concerns of fair play.

73.     The conduct of the Defendants' marketing scheme described above constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the DFS marketing scheme to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

74.     The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm the public, Plaintiff, and members of the Class.  Each such

racketeering activity was related, had similar purposes, involved similar or the same participants, had similar methods of commission, and had similar results affecting the same or similar victims, including Plaintiff and members of the Class.

75.     Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class paid millions of dollars to play DFS that they would not have paid had Defendants not engaged in this pattern of racketeering activity.

76.     The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity.

77.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and members of the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

78.     By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and members of the Class have suffered damages. Plaintiff and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**COUNT II - VIOLATION OF 18 U.S.C. § 1962 (D)**

79.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

80.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

81.     Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the promotion of DFS contests as described previously

through a pattern of racketeering activity. The Defendants conspired with, *inter alia*, each other, publicists, sales representatives, and other intermediaries to promote DFS contests and to suppress information regarding the unfair operation of their websites.

82. Defendants' and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and members of the Class.

83. The nature of the above-described acts by Defendants and their co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § l962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

84. As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § l962(c), Plaintiff and members of the Class have been and are continuing to be injured in their business or property as set forth more fully above.

85. Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

      a.      Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

      b.      Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

      c.      Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346;

      d.      Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

86. Defendants' violations of the above federal laws and the effects thereof are ongoing and will continue. Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have paid hundreds of millions of dollars to play DFS that they would not have paid had Defendants not conspired to violate 18 U.S.C. § 1962(c).

87. Injuries suffered by Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

88. Individuals, including Plaintiff and members of the Class, directly relied on the racketeering activities of the Defendants. Plaintiff and members of the Class, both directly and indirectly, relied on Defendants' promotions and representations regarding the fair play of their contests. Because Defendants controlled all knowledge upon which the claims of their contests' fair play were based, Plaintiff and members of the Class, as well as others in the public were obligated to rely on Defendants' representations. Further, Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of critical information regarding the unfair operation of their contests.

89. By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiff and members of the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

90. By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and members of the Class have suffered damages. Plaintiff and members of the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## COUNT III - VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES

91.     Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

92.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiff and members of the Class to pay money to participate in DFS contests on their websites.

93.     The actions and failures to act of Defendants (including the false and misleading representations and omissions of material facts, and the above described course of fraudulent conduct and fraudulent concealment) constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of DFS of Defendants, all in violation of the consumer protection statutes.

94.     Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented, and sold DFS participation to Plaintiff and members of the Class without disclosing their contests' lack of fair play, through their comprehensive and deceptive promotion program.

95.     Because Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented, and sold DFS participation, Defendants knew that their websites were operated illegally.

96.     Defendants' misrepresentations and omissions induced Plaintiff and members of the Class to pay for DFS participation.

21

97.    Defendants intended that Plaintiff would rely on their materially deceptive practices; and that Plaintiff and members of the Class would purchase or pay for DFS participation as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact to develop a niche market.   Defendants' deceptive representations and material omissions to Plaintiff and members of the Class were and are unfair and deceptive acts and practices.   Plaintiff and members of the Class were deceived by Defendants' misrepresentations.

98.    Defendants' actions, as complained of herein, constitute unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

99.    As a proximate result of Defendants' misrepresentations, Plaintiff and members of the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions of dollars to play DFS that they would not have paid had Defendants not engaged in unfair and deceptive conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

100.    Under the statutes listed herein to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices, Defendants are the suppliers, manufacturers, advertisers, and sellers that are subject to liability for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

101.    By engaging in the foregoing conduct, Defendants have violated the following State's Unfair and Deceptive Trade Practices and Consumer Fraud laws:

    a.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

b.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

c.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-101, *et seq.*;

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

e.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-105, *et seq.*;

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*;

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*;

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*;

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

j.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*;

k.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*;

l.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*;

m.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*;

n.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

o.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*;

p.  Defendants have engaged in unfair competition or unfair deceptive acts or practices in violation of LSA-R.S. 51:1401, et. seq.

q.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

r.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. COM. LAW CODE § 13-101, *et seq.*;

s.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

t.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

u.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*;

v.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*;

w.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

x.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601,  *et seq.*;

y.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

z.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, *et seq.*;

aa. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M Stat.§ 57-12-1, *et seq.*;

bb. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*;

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

ff.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, *et seq.*;

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*;

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of PA. CONS. STAT. § 201-1, *et seq.*;

ii.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN LAWS § 6-13.1-1, *et seq.*;

jj.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

ll.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

nn. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*;

oo. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451 *et seq.*;

pp. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

qq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

rr.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*;

ss.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT § 100.18, *et seq.*; and

tt.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN § 40-12-101, *et seq.*

102.    As a direct and proximate result of Defendants' wrongful conduct as alleged

herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

**COUNT IV - VIOLATIONS OF UNIFORM DECEPTIVE
TRADE PRACTICES ACTS**

103.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

104.    Plaintiff asserts this claim for violations of the Uniform Deceptive Trade Practices Act ("UDTPA"), which prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, … uses, [or] benefits … that they do not have," on behalf of a subclass composed of all class members who reside in the twenty-three states who have enacted these provisions of the UDTPA.

105.    Defendants engaged in deceptive trade practices in violation of the twenty-three state consumer protection statutes that incorporate the provisions of the UDTPA quoted above, by, *inter alia*, (a) failing to timely alert the public regarding known fairness issues with their contests; and (b) deliberately misrepresenting the fair play of their contests relative to other products; and (c) actively concealing, and causing others to conceal, information about the fair play of their contests.

106.    Defendants have violated the deceptive trade practices statutes of the following states that incorporate the provisions of the UDTPA quoted above, as follows:

    a.    Defendants have engaged in deceptive trade practices in violation of Ala. Code § 8-19-5, *et seq.;*

    b.    Defendants have engaged in deceptive trade practices in violation of Alaska Stat. § 45.50.471, *et seq.;*

    c.    Defendants have engaged in deceptive trade practices in violation of Cal. Civ. Code § 1770 *et seq.;*

d.      Defendants have engaged in deceptive trade practices in violation of 6 Del. C. § 2532, *et seq.;*

e.      Defendants have engaged in deceptive trade practices in violation of Ga. Code Ann. §§ 10-1-372, *et seq.* 10-1-393, and 26-2-29 *et seq.;*

f.      Defendants have engaged in deceptive trade practices in violation of Haw. Rev. Stat. § 481A-3, *et seq.;*

g.      Defendants have engaged in deceptive trade practices in violation of Idaho Code § 48-603 *et seq.;*

h.      Defendants have engaged in deceptive trade practices in violation of 815 Ill. L.C.S. § 510/2 *et seq.;*

i.      Defendants have engaged in deceptive trade practices in violation of 10 Me. Rev. Stat. Ann. § 1212, *et seq.;*

j.      Defendants have engaged in deceptive trade practices in violation of Mich. Comp. L. Ann. § 445.903 *et seq.;*

k.      Defendants have engaged in deceptive trade practices in violation of Minn. Stat. Ann. § 325D.44 *et seq.;*

l.      Defendants have engaged in deceptive trade practices in violation of Miss. Code Ann. § 75-24-5 *et seq.;*

m.      Defendants have engaged in deceptive trade practices in violation of Neb. Rev. Stat. §§ 81-2,285 *et seq.* and 87-302 *et seq.;*

n.      Defendants have engaged in deceptive trade practices in violation of N.H. Rev. Stat. § 358-A:2 *et seq.;*

o.      Defendants have engaged in deceptive trade practices in violation of N.M. Stat. Ann. § 57-12-2 *et seq.;*

p.      Defendants have engaged in deceptive trade practices in violation of Ohio Rev. Code § 4165.02 *et seq.;*

q.      Defendants have engaged in deceptive trade practices in violation of Or. Rev. Stat. § 646.608 *et seq.;*

r.      Defendants have engaged in deceptive trade practices in violation of 10 Penn. Stat. § 162.15 *et seq.* and 73 Penn. Stat. § 201-2 *et seq.;*

s.      Defendants have engaged in deceptive trade practices in violation of R.I. Gen. Laws § 6-13-1.1 *et seq.*;

t.      Defendants have engaged in deceptive trade practices in violation of Tenn. Code Ann. § 47-18-104 *et seq.*;

u.      Defendants have engaged in deceptive trade practices in violation of Tex. Bus. & Comm. Code § 17.46, *et seq.*;

v.      Defendants have engaged in deceptive trades practices in violation of Utah Code § 13-11a-3 *et seq.*;

w.      Defendants have engaged in deceptive trade practices in violation of W.Va. Code § 46A-6-102 *et seq.*;

107.    To date, Defendants continue to engage in the foregoing unlawful practices in violation of the UDTPA and the deceptive trade practices statutes of the above-referenced states that incorporate the UDTPA.

108.    As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT V - REDHIBITION

109.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

110.    Plaintiff brings this Count pursuant to Louisiana Civil Code Articles 2520 *et seq.*

111.    Defendants' products contained a vice or defect that rendered it either absolutely useless or its use so inconvenient and imperfect that it must be supposed that the buyers would not have purchased it had they known of the vice.

112.    Defendants impliedly or expressly represented that their contests put participants on a level playing field. The presence of the unfair characteristics of products is a vice as provided by Louisiana Civil Code Articles 2520 *et seq.* regarding redhibition, rendering the

Defendants liable in redhibition.

113.    Because Defendants knew of the vice as described above and failed to declare it to Plaintiff and members of the Class, Defendants are liable for all damages including reasonable attorneys' fees as provided by Louisiana Civil Code Articles 2525 and 1953 *et seq.*

## COUNT VI - UNJUST ENRICHMENT

114.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

115.    Plaintiff and the members of the Class conferred a benefit on Defendants by depositing money and playing in contests on their websites.

116.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and the members of the Class deposits and contest entries.  Such retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fairness of their contests.

117.    Plaintiff and members of the Class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the Class for their unjust enrichment, as ordered by the Court.

## COUNT VII – EQUITABLE RELIEF

118.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

119.    Pursuant to the equitable relief provisions of the applicable consumer protection

laws of the 50 states, Plaintiff seeks temporary and/or permanent injunctive relief directing Defendants to cease their deceptive practices and fraudulent activities; and, that Defendants notify in writing, and through other appropriate forms of notice, all members of the Class as to the restrictions imposed on Defendants.

120.    Defendants' contests have been heavily marketed to the public but not all consumers will necessarily be aware of the action required of Defendants.

121.    Such notice is necessary to enable consumers prospectively to limit their payments only to those websites that exhibit fair play. Without such notice, consumers will continue to incur improper costs or charges in future.

122.    Without such notice, consumers risk irreparable harm from continuing to pay for unfair DFS contests.

123.    The equitable relief sought pursuant to the applicable consumer protection laws of the 50 states is within the jurisdiction of this Honorable Court.  The proposed notice class meets the requirements of Fed. R. Civ. P. 23(b)(2). Under this claim, Plaintiff seeks no monetary damages on behalf of the proposed (b)(2) class. As noted herein, the proposed class meets the requirements of Rule 23.  As such, equitable relief under Rule 23(b)(2) is appropriate and a (b)(2) class should be certified for the purposes of notice to consumers as set forth herein.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jon Cosper, individually and on behalf of the Class described herein, respectfully pray for the following relief:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), appointment of Plaintiff as a representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;

B.    Enter joint and several judgments against Defendants in favor of Plaintiff and the Class.

C.      A finding that Defendants' wrongful conduct alleged herein violated the consumer fraud and protection statutes and deceptive trade practices statutes set forth above, and an award for all measures of damages allowable under such statutes, in an amount to be determined at trial, plus costs of suit, including reasonable attorneys' fees and litigation expenses;

D.      Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

E.      Grant Plaintiff and the Class an award for damages and, where applicable, treble, multiple, punitive, and/or other damages, in a such amount to be determined at trial and as provided by applicable law;

F.      Grant Plaintiff and the Class injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

G.      An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

H.      Grant Plaintiff and the Class pre-judgment and post-judgment interest on all damages;

I.      Grant Plaintiff and the Class costs of suit, including reasonable attorneys' fees and litigation expenses as provided by law; and

J.      Grant Plaintiff and the Class all such other and further relief as necessary to correct Defendants' unlawful conduct, and as the Court deems just and proper under the circumstances.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: December 11, 2015

Respectfully submitted:

*/s/ James R. Dugan, II*
James R. Dugan, II (LSBA# 24785)
David B. Franco (TXSBA# 24072097)
Lanson Bordelon (LSBA# 34251)
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
Email: jdugan@dugan-lawfirm.com
Email: dfranco@dugan-lawfirm.com
Email: lbordelon@dugan-lawfirm.com

Jeremy Schafer
Miller Legal, LLP
1101 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
Telephone: (202) 769-0007

Russ M. Herman
Leonard A. Davis
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Ph: (504) 581-4892
Fax: (504) 561-6024

And

/s/ Chris Seeger
Chris Seeger, Esquire
Seeger Weiss, LLP
77 Water Street
New York, NY  10005
Phone: (212) 584-0700
Fax: (212) 584-0799 (facsimile)
Email: CSeeger@seegerweiss.com

***Attorneys for Plaintiff and the Proposed Class***